NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific* *Reporter*. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| IVAN J. SNOWDEN, | Court of Appeals No. A-10971 |
| Appellant, | Trial Court No. 4FA-08-820 CR |
| v. | |
| STATE OF ALASKA, | O P I N I O N |
| Appellee. | No. 2456 — June 19, 2015 |

Appeal from the Superior Court, Fourth Judicial District, Fairbanks, Robert B. Downes, Judge.

Appearances: Colleen A. Libbey, Libbey Law Offices, Anchorage, for the Appellant. Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Hanley, District Court Judge.[*]

Judge MANNHEIMER.

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

A little after 3:00 in the morning on March 14, 2008, the Fairbanks police received an "open-line" 911 call. That is, someone called 911, but when the dispatcher answered the call, there was no response — just an open telephone line (although the dispatcher heard a sound like a cough).

The 911 dispatcher determined that the call originated from Mom's Kitchen, a local restaurant, and police officers were dispatched to this restaurant to investigate the call. During this investigation, the officers entered the residence of Ivan J. Snowden, who lived in an apartment downstairs from the restaurant. The police found no emergency, but they did find drugs in plain view. Based on the discovery of these drugs, Snowden was convicted of third- and fourth-degree controlled substance misconduct.

In this appeal, Snowden contends that the police entry into his apartment was unlawful, and that the superior court therefore should have suppressed the drugs. For the reasons explained in this opinion, we conclude that the entry into Snowden's apartment, and the ensuing search of the apartment, were justified under the emergency aid exception to the warrant requirement. We therefore uphold the search, and we affirm Snowden's convictions.

*Underlying facts*

At 3:16 in the morning on March 14, 2008, the Fairbanks 911 dispatch received a 911 call from Mom's Kitchen. When the 911 dispatcher answered the call and asked what was the nature of the emergency, she heard no response — although the caller did not hang up the phone. As the dispatcher listened to the open line, she heard what she believed was a cough.

Several Fairbanks police officers went to Mom's Kitchen to investigate.

Mom's Kitchen occupied the upper floor of a two-story building. The bottom floor of the building was rented as an apartment — although the officers did not know this until later.

The building had a front entrance that went into the restaurant. The building also had a back entrance (an arctic entry) that led inside to a landing. From this landing, stairs went up directly into the restaurant (with no intervening door), and stairs also went down into the apartment, but one had to go through an intervening door to get into the apartment.

Around the time the officers arrived at Mom's Kitchen, a taxi cab pulled up to the rear of the building. The taxi driver told the officers that he was there to pick up a man named "Jay" — but this person never showed up.

The officers went to the front of the building to try the door, but it was locked. The officers then proceeded to the back entrance, where they discovered that the door was standing open about three to four inches. Speaking through the open door, the officers announced themselves, but there was no response.

The officers then entered the building and went up the stairs to the restaurant portion. There, they found a cordless phone sitting on a table in one of the restaurant booths. This was the phone that had been used to make the 911 call, and its line was still open — but there was no one in the restaurant. The police saw no sign of an emergency (or of any criminal activity).

The officers then proceeded down the stairs to search the lower floor of the building. Finding that the door to the lower floor was locked, the officers knocked on the door and announced themselves. They were greeted with silence.

At this point, the officers still did not know that the lower floor of the building was an apartment. But when they contacted one of the owners of the building (Lee Brown), Brown informed them that he was renting the lower floor to a man named

"Ivan Peterson". Brown came to the building and brought keys so that the officers could enter and inspect the lower floor.

When Brown arrived on the scene, he met the officers in the restaurant portion of the building. Brown told the officers that there was a photograph of Ivan Peterson on the restaurant wall. When Brown pointed out this photograph, one of the officers recognized "Peterson" as a man named Ivan Snowden — a man who was known to the police because of his involvement with drugs.

When the officers asked Brown if Snowden's apartment was self-contained, Brown told them that it was not: Snowden had access to the restaurant because there was no bathroom in his apartment, so he used the one upstairs in the restaurant.

The officers returned to the door that led downstairs into the apartment. They knocked loudly on the door, and they announced themselves as police officers. In response to their announcement, the officers heard movement inside the apartment; they then heard someone "fiddling" with the door, and Snowden opened the door.

The officers had Snowden step out of the door, and they frisked him for weapons. Following this frisk, the officers asked Snowden what was going on inside his apartment. Snowden replied that he was just watching a movie with two of his friends. The officers then placed Snowden in handcuffs, and one of them took Snowden upstairs to the restaurant.

After restraining Snowden, the police entered Snowden's apartment to see if anyone inside needed assistance. Inside the apartment, the officers smelled both burnt and fresh marijuana. They also found a man and a woman, both of whom appeared to be intoxicated, sitting in the apartment.

In response to the officers' questions, the man and the woman declared that they had not called 911. In addition, neither of the two was named "Jay" (the person that the taxi driver was waiting for).

The man and the woman told the officers that there was no one else in the apartment. Nevertheless, the officers looked through the apartment. They found no other people — although they did see some marijuana in plain view. During their examination of the apartment, the officers discovered that the apartment contained an office area, which was locked. Because the officers were concerned that there might be a person inside this office area, they unlocked the office (with a key that they had seized from Snowden during the frisk). The office was empty, and it contained no evidence of either an emergency or criminal activity.

After inspecting the office, the officers looked behind a bar area in the apartment. At this point, one of the officers smelled the odor of cocaine and noticed a white, powdery substance on one of the counters. When the officer took a swab of the substance and tested it with a drug kit, the substance tested positive for cocaine.

Based on this drug evidence, the police obtained a search warrant. The ensuing search of the apartment (under the authority of the warrant) yielded 20.8 grams of cocaine, 7.6 grams of methamphetamine, 130.4 grams of marijuana (about 4½ ounces), and two tablets of MDMA.

*The legality of the officers' warrantless entry into Snowden's apartment*

Under both the Alaska constitution and the federal constitution, police officers can enter a dwelling without a warrant if their entry is for the purpose of investigating or responding to what they reasonably believe is an ongoing emergency. *State v. Gibson*, 267 P.3d 645, 658-59 (Alaska 2012); *Gallmeyer v. State*, 640 P.2d 837, 841-42 (Alaska App. 1982); *Brigham City v. Stuart*, 547 U.S. 398, 403; 126 S.Ct. 1943, 1947; 164 L.Ed.2d 650 (2006).

In *State v. Gibson*, our supreme court laid out a three-part test to govern the question of whether, under the Alaska constitution, a warrantless entry into a residence is justified under this emergency aid exception to the warrant requirement:

> [T]he Alaska Constitution requires that warrantless searches under the emergency aid doctrine satisfy [the] three ... prongs specified in *Gallmeyer*: (1) the police must have reasonable grounds to believe there is an emergency at hand and an immediate need for their assistance in the protection of life or property; (2) the search must not be primarily motivated by the intent to arrest a person or to seize evidence; and (3) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*Gibson*, 267 P.3d at 659.

In the present case, the superior court expressly applied the *Gibson* test to the facts of Snowden's case and concluded that the police could validly conduct a warrantless entry of the building, and later of Snowden's apartment, to investigate the "open-line" 911 call. More specifically, the superior court concluded that the police could reasonably suspect that the telephone line was left open because "the person who had made the call was interrupted [while] making the call", or because the caller "[put] the phone down and ran", or because the caller "was immediately grabbed or seized, and the phone ... wasn't hung up."

On appeal, Snowden argues that an open-line 911 call is not sufficient, standing alone, to justify a warrantless entry into a dwelling. Snowden further argues that there was nothing else about the facts of his case to affirmatively corroborate the existence of an emergency (*i.e.*, an "immediate need for [police] assistance in the protection of life or property"). *Gibson*, 267 P.3d at 659.

We agree with Snowden's first assertion: An open-line 911 call is not sufficient, standing alone, to justify a warrantless entry into a dwelling. We acknowledge that an open-line call to an emergency operator is obviously a suspicious circumstance. But whenever the State seeks to justify a warrantless entry under the emergency aid exception to the warrant requirement, the proposed justification for the entry must be assessed in light of the *totality* of the circumstances. As our supreme court stated in *Gibson*:

> Application of the emergency aid exception to the warrant requirement cannot be evaluated with across-the-board, rigid, and formalistic standards; it is a flexible doctrine that ... must be evaluated on a case-by-case basis, balancing the competing interests in light of the actual facts, perceived dangers, and circumstances encountered by police.

267 P.3d at 661.

But we disagree with Snowden's assertion that there was nothing else to affirmatively corroborate the police officers' suspicions of an emergency.

Here, the 911 call was made in the middle of the night — shortly after 3:00 in the morning. When the police arrived at Mom's Kitchen in response to the call, they found the back door to the building standing ajar. In addition, the police knew that a taxi had been summoned to that address, but the customer never appeared.

Before the police entered the building through the back door, they announced themselves, but they received no response. Inside the restaurant (*i.e.*, on the upper floor), the officers located the cordless phone that had been used to make the 911 call. This phone still had an open line, but there was no one in the restaurant.

At this point, the police turned their focus to the lower floor of the building — which, they learned, was rented by Snowden. When the officers knocked on the door and announced who they were, Snowden opened the door and told the police that

nothing was wrong; he told the officers that he was just watching a movie with two of his friends.

As both a factual and legal matter, this was a turning point in Snowden's case. As a factual matter, the police officers had to make a decision: they could either accept Snowden's statement, and simply write off the 911 call as unexplained, or they could enter Snowden's apartment to investigate further.

The related legal issue — the issue that this Court must resolve — is whether, after Snowden told the officers that he was simply watching a movie with friends, the officers still had reasonable grounds to believe that an emergency was occurring, as well as "some reasonable basis, approximating probable cause, to associate [that] emergency" with Snowden's apartment. *Gibson* at 659.

We have found a few other court decisions dealing with similar facts: a warrantless police entry prompted by a suspicious 911 call (either an open-line call like the one in this case, or a call where the caller immediately hung up and did not answer the 911 operator's return call), where the occupant of the home told the police that there was no emergency.

For instance, in the New Jersey case of *State v. Frankel*, 847 A.2d 561 (N.J. 2004), a police dispatcher received an open-line 911 call from a telephone number listed in the defendant's name. Because the dispatcher could not make contact with the 911 caller, an officer was dispatched to the defendant's residence. *Id.* at 574.

When an officer arrived at the front door, he found that someone had hung a sheet inside the house, obstructing his view of the interior. In response to the officer's knocking, the defendant poked his head out from behind this sheet and told the officer that he lived alone, and that he did not make the 911 call. *Ibid.* Fearing that there was an incapacitated victim inside the house, the officer asked the defendant to explain the

911 call. According to the officer, when the defendant responded to this question, he was unusually nervous and agitated, and he stumbled over his words. *Ibid*.

The New Jersey court noted that a 911 call "is tantamount to a distress call[,] even when there is no verbal communication over the telephone to describe the nature of the emergency." *Ibid*. Thus, "[a] responding police officer is not required to accept blindly the explanation ... offered by the resident answering the door, but must base his decision on the totality of the circumstances." *Ibid*. The court held that, given the circumstances in this case, the officer "did not have to give uncritical acceptance to defendant's belated explanation that his computer modem may have caused a false 911 transmission", and that the officer could justifiably enter the house to investigate. *Id.* at 574-75.

Similarly, in *People v. Greene*, 682 N.E.2d 354 (Ill. App. 1997), a police dispatcher received a "hang-up" call to 911. When the dispatcher made a return call to that number, the dispatcher was connected to an answering machine. The dispatcher thereupon sent officers to the residence where the call originated. *Id.* at 355-56.

The officers knocked on the screen door to the defendant's porch, and they received no response. They then opened the porch door and proceeded to the front door. *Ibid*. Looking through a window in the front door, the officers saw the defendant seated on a couch in the living room. When they knocked on the door and announced their presence, the defendant walked to the door, locked the dead bolt lock, and then returned to the couch, at which time he appeared to hide something under a cushion. *Ibid*.

The officers persisted in their knocking until the defendant returned to the door and opened it. The officers told the defendant that they had received a 911 call from his house — to which the defendant replied that he had not called 911, and that he was alone in the house. The police nevertheless entered the house to investigate, and they found drugs. *Ibid*.

The Illinois court upheld this warrantless entry:

> We conclude that these peculiarities made it reasonable for the police to believe that someone within the house was attempting to call 911 for help but was prevented from completing the call. Accordingly, the officers' entrance was justified by the exigent circumstances presented to them. If we were to adopt the rule urged by defendant, the police would never be authorized to enter and offer assistance in such a situation.

*Greene*, 682 N.E.2d at 358-59.

In *State v. Pearson-Anderson*, 41 P.3d 275 (Idaho App. 2001), the court upheld a warrantless entry into a dwelling in a case where the police received a suspicious 911 call from the defendant's house:  the initial 911 call was a hang-up call, and when the 911 operator called back, someone picked up the phone but then immediately hung up. *Id.* at 275-76.

When police officers arrived at the residence, they observed the defendant and her live-in boyfriend struggling with one another on the floor across the threshold of the back door. *Id.* at 276.  The defendant told the police that she was fighting with her boyfriend because he "had given a key to the home to another woman", and this woman had entered the house and damaged some of the defendant's belongings. *Ibid.*  The defendant told the police that this other woman had been there "earlier", but she had left. *Ibid.*

One of the officers decided to enter the home to see if any third persons were present in the home and in need of assistance. *Id.* at 277.  The officer found no one in distress, but he did discover a meth lab. *Ibid*.

The Idaho court upheld the warrantless entry into the home.  The court reasoned that the initial hang-up 911 call, followed by someone hanging up the phone

– 10 – 2456

when the dispatcher called back, "suggested that someone in the home ... was in need of help" and that this person "had been prevented by another person from communicating with the operator." *Id.* at 278. The court rejected the defendant's contention that the officers were barred from entering the home after someone at the scene offered a seemingly plausible explanation for the hang-up call and assured the officers that no one was in distress. *Id.* at 276, 278.

See also *State v. Lynd*, 771 P.2d 770 (Wash. App. 1989), where the court upheld a warrantless entry into a dwelling in a case where a police dispatcher received a hang-up 911 call, the line was busy when the dispatcher called back, and the defendant admitted to the police that he and his wife had been fighting, but the defendant claimed that his wife was no longer at home.

As we said earlier in this opinion, the law does not allow police officers to enter a home without a warrant simply because the police have received a suspicious 911 call. There will be times when the explanation offered by the people in the home, coupled with the officers' observations at the scene, will dispel any reasonable ground for believing that there is an ongoing emergency. But the police are not required to set aside their reasonable concerns that people are in danger simply because someone at the home claims that there is no emergency.

In Snowden's case, someone called 911 from Mom's Kitchen at 3:00 in the morning. After this person made the 911 call, they left the line open, they left the phone on the table of the empty restaurant, and then they seemingly disappeared. A taxi cab was waiting outside the building for a customer who never showed up. The police searched the upper floor of the building, and they found no one. The only place left to look was the lower floor — Snowden's apartment.

It is true that Snowden disclaimed any knowledge of the 911 call, and he told the police that he had simply been socializing and watching a movie. But given the

other suspicious circumstances, the police were not required to uncritically accept Snowden's statement.

In the end, the question here is whether the totality of the circumstances, including Snowden's statement, left the police with reasonable grounds to believe that there was an emergency at hand (*i.e.*, an immediate need for their assistance in the protection of life or property), and a reasonable basis, "approximating probable cause", to associate this emergency with Snowden's apartment.

We conclude that the answer to this question is "yes", and we therefore conclude that the officers' warrantless entry into Snowden's residence was justified under the emergency aid exception to the warrant requirement.

*The scope of the officers' search of the apartment*

In his brief to this Court, Snowden presents the alternative argument that even if the officers' entry into his apartment was justified, the officers' search of the apartment was at least partially unlawful — under the theory that the *scope* of this search exceeded the kind of search that would be justified by the apparent emergency.

Although Snowden mentioned this argument in passing when he argued his suppression motions in the superior court, he obtained no ruling from the superior court on this issue. Snowden therefore failed to preserve this claim for appeal. And under the supreme court's decision in *Moreau v. State*, 588 P.2d 275, 280 (Alaska 1978), Snowden can not raise this claim for the first time on appeal. We therefore do not reach the merits of this claim.

*Conclusion*

The judgement of the superior court is AFFIRMED.